UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUNSET GARDEN OF RIDGEWOOD, INC., and INDALESIO TELLEZ,<br><br>　　　　　　　　　　*Plaintiffs*,<br><br>v.<br><br>THE CITY OF NEW YORK, NYC DEP'T OF PARKS AND RECREATION, NYC PARKS GREENTHUMB, and CARLOS MARTINEZ, CHIEF OF STAFF OF NYC PARKS GREENTHUMB<br><br>　　　　　　　　　　*Defendants*. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PRELIMINARY INJUNCTION**<br><br>Civil Case No.: 1:25-cv-04258 (LDH)(MMH)<br><br>Hon. Judge LaShann DeArcy Hall and Magistrate Judge Marcia M. Henry |

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**..................................................................................................4

**FACTUAL BACKGROUND**....................................................................................................5

**LEGAL STANDARD**..............................................................................................................10

**ARGUMENT**...........................................................................................................................11

    I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS......................................11

        A. Defendants' Actions Constitute Unconstitutional Viewpoint Discrimination and Retaliation...................................................................................................................11

        B. Defendants Have Discriminated Against Plaintiffs in Violation of the NYCHRL.......12

    II. PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM..................13

        A. The Loss of First Amendment Freedoms is Irreparable Harm Per Se..........................14

        B. The Destruction of an Irreplaceable Community Sanctuary and the Garden Itself, and the Possible Damage to the Altar to Cecilia, are Irreparable Harms.................................15

        C. The City-Fomented Climate of Harassment Threatens Grave Irreparable Harm.........17

    III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR PLAINTIFFS........................................................................................................................18

**CONCLUSION**........................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Elrod v. Burns*, 427 U.S. 347 (1976)..................................................................................11, 14, 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557 (1995)................15

*Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992)........................................................................18

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)...........................................................15

*New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339 (2d Cir. 1989)................................19

*Nken v. Holder*, 556 U.S. 418 (2009).............................................................................................19

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013).................................................14

*Palmore v. Sidoti*, 466 U.S. 429 (1984)..................................................................................17, 19

*Perry v. Sindermann*, 408 U.S. 593 (1972)....................................................................................12

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)..................................................................12

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)................................................................................12

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)................................................17

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995)...................................11

*Spence v. Washington*, 418 U.S. 405 (1974)...................................................................................14

*Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62 (1st Dep't 2009).....................................................12

*Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020)...............................................................................10

**Statutes**

N.Y.C. Admin. Code § 8-107….*passim*

**Constitutional Provisions**

N.Y. Const. art. I, § 8….*passim*

U.S. Const. amend. I….*passim*

3

## PRELIMINARY STATEMENT

This motion seeks immediate relief to prevent the irreparable harm that will occur if the City of New York is permitted to dismantle a community garden and cultural sanctuary in retaliation for its protected speech and collective expressions of solidarity with its many queer, Latine, Black, Indigenous, and immigrant members. Under the pretext of neutrally enforcing administrative rules it admittedly ignores for others, the City has engaged in a discriminatory campaign of censorship and intimidation against Plaintiffs. This campaign is set to culminate in the official termination of the Garden's organization, the dissolution of its community, and the destruction of the garden itself, directly chilling Plaintiffs' First Amendment rights and fomenting a climate of violent racist and transphobic death threats and harassment.

Plaintiffs have demonstrated a clear likelihood of success on the merits. Their claims are supported by direct evidence of pretext, including admissions from Defendants' own officials that the City's policies were "unfair," its requirements were "changing," it acted at the behest of, and "empower[ed]," a "transphobe," and that it "turn[s] a blind eye" for other gardens but not this one (Ex. A, K; Tellez Aff. 6; Compl. 1). The loss of First Amendment freedoms, for even a moment, constitutes irreparable harm *per se*. In this case, that deep and unconstitutional injury is compounded by the threatened disruption of a unique community safe haven and the very real danger of physical harm that Plaintiffs now face from malicious racists, xenophobes, and transphobes emboldened by the City's actions. (Ex. L; Tellez Aff. 10; Ayres Aff. 6; Compl. 22). The balance of equities tips decidedly in Plaintiffs' favor, as the harm they face is immense and the City suffers none by maintaining the status quo. For these reasons, and as set forth below, the Court should issue a Preliminary Injunction immediately.

4

## FACTUAL BACKGROUND

The facts supporting this motion are detailed in the verified Complaint and the contemporaneously filed exhibits and Affidavit of Indalesio Tellez. In brief, Plaintiff Sunset Garden of Ridgewood, Inc. ("the Garden") is a vital community space in Queens, intentionally cultivated as a safe haven for the public and particularly the Garden's many members and leaders who are Queer, Trans, Black, Indigenous, and People of Color ("QTBIPOC"), who often face discrimination, harassment, and intimidation outside the garden. (Ex. E, F, G, L; Tellez Aff. 2, 10-13; Compl. 4, 12, 13, 22).

In September 2024, Defendants began a targeted campaign against the Garden, not out of any neutral administrative concern, but only after receiving complaints from a resident who objected to its QTBIPOC mission and values statements—a person a GreenThumb Director admitted in writing was a "transphobe" empowered by Defendants. (Ex. A; Tellez Aff. 3; Compl. 14). Defendants manufactured two pretexts for their actions, targeting the two most visible symbols of the Garden's QTBIPOC-affirming identity:

1. *The "Community Values":* Defendants attacked the Garden's anti-harassment and anti-discrimination values, agreed upon after extensive group input, falsely characterizing them as an impermissible "ideological litmus test" and demanding their censorship. (Ex. H, M; Tellez Aff. 4; Ayres Aff. 4; Compl. 16, 17). Among other things, these agreed upon values say that the Garden stewards will "interrupt" "violent behavior or rhetoric that expresses all forms of hate (such as homophobic, transphobic, sexist, ableist, fatphobic, xenophobic, Zionist, anti-semitic, nationalist and or racist beliefs) in order to

5

preserve a safer space." (Ex. M; Tellez Aff. 4; Ayres Aff. ¶¶ 1-6; Compl. ¶¶ 16, 17). In the landing page for its online membership form, to help ensure knowledge of the organization's current shared values and that members would interrupt hateful behavior, the Garden asked potential members to "[p]lease take a moment to read our Community Values, which our members have developed together" and explained that the Garden prudently "strives to have members that align with our Community Values and vision of the world we are building together." (Ex. H). In retaliation for expressing solidarity and anti-discriminatory values, and the promise to intervene in discriminatory behavior, the City continues to repress and attempt to terminate the Garden, falsely claiming that the Garden did not make membership open to the public. (Ex. G, H, K, N). To the contrary, members come from all backgrounds and faiths, and has never barred anyone from membership. (Tellez Aff. 2, 4; Ayres Aff. ¶¶ 1-6). Furthermore, the Garden explicitly wrote that prospective members must sign "the *Sunset Garden Bylaws and rules*," *not* the Community Values statements, which were simply expressions of the Garden's current mutually-held values, not barriers to public membership. (Ex. F, G, M).

2. *The Altar for Cecilia Gentili:* Defendants seized upon a small (3 x 3.5 ft) but irreplaceable communally-made memorial altar to a revered transgender activist and community member, declaring it an "unauthorized installation" subject to onerous requirements, while simultaneously ignoring a far larger, seven-foot-tall and five-foot-wide unlicensed, brightly painted woodcut installation in the very same garden and the other hundreds of unlicensed art installations in GreenThumb's other gardens, in

6

direct contravention of the GreenThumb Handbook, which requires pre-approval only for "*Large* art installations." (Ex. C, J, Tellez Aff. ¶ 5; Compl. ¶¶ 18-20).

The City's claim of neutral enforcement by Defendants is totally contradicted by admissions from the Defendants themselves. GreenThumb Chief Carlos Martinez admitted in a recorded meeting that the agency routinely "turn[s] a blind eye" to similar art installations in other gardens, and Assistant Director of Community Engagement Alex Muñoz apologized for "the unfair policies." (Ex. A, B; Tellez Aff. ¶ 6; Compl. ¶ 15, 20).

Furthermore, as Muñoz also admitted via text, there were "changing requirements." (Ex. A). These shifting demands and deadlines functioned as goalposts that were intentionally moved to make the Garden appear as if it was out of compliance and unwilling to negotiate, despite assurances and acknowledgments of the Garden's responses. (Ex. A, B, K; Tellez Aff. ¶ 4; Compl. ¶¶ 15-20). For example, the City's demand on April 1, 2025 was simple and limited: the Garden was asked to provide an "an update on which direction the community garden group would like to move in." (Ex. K; Tellez Aff. ¶ 4). Plaintiffs met this demand by April 3, despite having again received no response to critical questions regarding GreenThumb's rules, including what qualified as a "Large" art installation, and whether this pre-approval rule had been enforced in any of the other hundreds of GreenThumb gardens. (Ex. K; Tellez Aff. ¶ 5). In response to the Garden's meeting GreenThumb's latest demand, Muñoz said "Thank you! Acknowledged." (Ex. K; Tellez Aff. ¶ 4). Less than two weeks later, on April 15, the City treated the Garden as if it had defied a hard deadline for full compliance, issuing a final notice and ultimatum for compliance or termination. (Ex. B, K; Tellez Aff. ¶ 4).

7

This abrupt escalation suggests the City was not interested in working with the garden as it had promised, but was instead manufacturing flimsy grounds on which to terminate it. (Ex. B, K; Tellez Aff. 4). The City's next move was not to continue the collaborative process it appeared to accept, but to dramatically escalate its admittedly abnormal behavior by issuing a final, non-negotiable demand. (Ex. A, B, K; Tellez Aff. 4; Compl. ¶¶ 15-20).

The City's actions have emboldened a vicious campaign of public vilification, racist death threats, and in-person intimidation and harassment. Following the City's attacks and scurrilous right-wing media coverage, Plaintiffs have been subjected to a torrent of explicit, violent threats, including calls to murder the Garden's members with "sarin gas," and to destroy the Garden and "stop the Moos lum festation" ('Muslim infestation,' altered to avoid automatic censorship) with "weed killer," bulldozers, and "gasoline and matches." (Ex. L; Tellez Aff. 10; Compl. 22, 23). Another commenter urged others to "Kilemal," ('Kill them all') "and their families who support them and"—ironically, and in the custom of xenophobic racism—"their terrorism." (Ex. L). One commenter promised to "pay $5000" to anyone who would destroy the garden. (Ex. L). A transgender member was dehumanized as "an It," and Muslim members were targeted with racist slurs alongside the death threats, including "table cloth heads" and "Savagastinians" (combining the quintessential colonial slur 'savages' with 'Palestinians.'). (Ex. L; Tellez Aff. 10(c); Compl. 23).

This online vitriol has already manifested in person: on September 22, 2024, six white men entered the Garden and aggressively cornered and intimidated two Middle Eastern immigrant garden stewards and interrogated them, including asking who they were, where they were from, how they got keys to the garden, and whether they were "pro-Hamas." (Tellez Aff.

8

11; Compl. ¶ 22). Plaintiffs informed the City about this harassment and requested protective support on April 11, 2025 in their recorded in-person meeting with Carlos Martinez and other GreenThumb leaders, but Defendants did nothing to protect the Garden and have only continued their discriminatory campaign, including against the Garden's Community Values statements, meant to protect against precisely this type of discriminatory, violent behavior—signaling quite clearly to the public that Defendants condone and will not prevent it. (Tellez Aff. ¶ 11).

The City's campaign of harassment has escalated to include public condemnation from its highest official, who has intentionally mischaracterized the facts to foment public hostility against the Garden. On August 16, 2025, Mayor Eric Adams personally intervened, falsely and potentially defamatorily telling the New York Post that the Garden had reprehensibly "barred some of their fellow New Yorkers… because of their beliefs," and vowing to "stamp out hate wherever it is found." (Ex. O; Ayres Aff. ¶¶ 1-6). This false narrative adopts the very pretext used to terminate the license, and serves to ratify the discriminatory actions of its agencies and have poured fuel on the fire of the racist, transphobic campaign against Plaintiffs.

In addition to the bodily harm the City's actions are risking for the Garden's members, including its Jewish members, formerly under the guise of neutral rule enforcement and now openly with false claims of anti-semitism, the Garden itself faces destruction from the City's withholding of critical resources and its threatened disruption of the Garden's organization. (Ex. B, L, O; Tellez Aff. ¶¶ 13-20; Ayres Aff. ¶¶ 2-6). Hundreds of pounds of fall harvest foods from the currently flourishing garden are threatened if the organization is disrupted and the gates are locked as the City has threatened (Tellez Aff. ¶¶ 13-15). These crops have been carefully, thoughtfully, and laboriously cultivated, and include those of cultural significance such as crops

9

grown from seeds from prior harvests, indigenous corn and herbs, and pumpkins meant to be used in the Garden's annual Halloween festival, beloved by local families. (Tellez Aff. ¶¶ 13-20). The hundreds of pounds of crops annually provide much-needed nutrition in what is otherwise a food desert for many. (Tellez Aff. ¶¶ 13-14). The cultivation, harvesting, and composting processes are labor-intensive and complex, and the City's actions and withholding of resources threaten to disrupt them all and lay this vibrant, priceless garden to waste. (Tellez Aff. ¶¶ 13-20).

On May 5, 2025, the City terminated the Garden's license, citing its selectively enforced, pretextual, and manufactured rule violations. (Ex. H; Tellez Aff. 8). On August 12, 2025, the City fully abandoned its prior commitments to negotiate in good faith, issuing another Notice to Vacate by September 3rd, citing only the prior termination based on the very same discriminatory pretexts. (Ex. N).

Without this Court's immediate intervention, the Garden community will be disrupted and its constitutionally protected speech and expressions violated. The irreplaceable altar and the garden itself face destruction and Defendants will continue to foment unchecked racist harassment and death threats. Plaintiffs will otherwise continue suffering irreparable harm.

**LEGAL STANDARD**

A party seeking a Preliminary Injunction must show: "(1) irreparable harm in the absence of the injunction; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir.

10

2020). Where a party seeks to enjoin government action taken pursuant to a statutory or regulatory scheme, the movant must demonstrate a likelihood of success on the merits. *Id.* When a plaintiff demonstrates that their First Amendment rights have been violated, the requirements of irreparable harm and that the injunction is in the public interest are presumed. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs' claims for viewpoint discrimination, retaliation, and unlawful discrimination on the bases of protected statuses are supported by overwhelming evidence of pretext and selective enforcement.

**A. Defendants' Actions Constitute Unconstitutional Viewpoint Discrimination and Retaliation.**

The First Amendment forbids the government from regulating speech based on its substantive content or the message it conveys. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Here, Defendants' entire course of conduct has been a reaction to the Garden's QTBIPOC-affirming, anti-discriminatory, pro-human rights viewpoint. The City's campaign began only after complaints from a known "transphobe," attacking the two most prominent symbols of the Garden's QTBIPOC-affirming identity: its anti-harassment "Community Values" and its altar for a beloved Latina transgender activist. (Ex. A, C, J, M; Compl. ¶¶ 14, 16-17). The demand that Plaintiffs censor this speech, coupled with the license

11

termination when they refused, is a textbook case of viewpoint discrimination. Such content-based restrictions on speech are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Furthermore, terminating a license and withholding benefits because a licensee engaged in protected speech is a classic form of unconstitutional retaliation. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."). The City's justifications are transparently pretextual, given the multiple admissions of selective enforcement and the targets of that enforcement. (Ex. A, C, J; Tellez Aff. ¶¶ 4-6).

The City's anticipated defense that the altar constitutes "government speech" under *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), is meritless. No reasonable observer would mistake a small, unique, communally-built altar in the corner of a community garden for an official statement by the City of New York, and the License agreement explicitly disclaims City control over and responsibility for the Garden's members and their conduct. (Compl. ¶ 30). The Garden is, at minimum, a designated public forum for private speech, where viewpoint discrimination by the State is forbidden.

### B. Defendants Have Discriminated Against Plaintiffs in Violation of the NYCHRL.

The New York City Human Rights Law ("NYCHRL") makes it unlawful for a city agency to treat any person "less well" on the basis of their gender identity, sexual orientation, or race. N.Y.C. Admin. Code § 8-107(4)(a), (9)(a)(1); *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009). Plaintiffs have put forth damning evidence that they were treated less well

12

on the bases of these protected statuses. The admission that Defendants "turn a blind eye" to similar alleged infractions in other gardens (Tellez Aff. 6), but chose to enforce the rules strictly with "unfair policies" and "shifting requirements" (Ex. A) against *this* QTBIPOC-led garden, is direct evidence of disparate treatment. The further admission that the City was "empowering a transphobe," and the fact of Defendants' targeting the Garden's two most prominent expressions of QTBIPOC-affirmation, confirms disparate treatment on the basis of protected statuses, easily satisfying the NYCHRL's broad remedial standard. (Ex. A, C, J, M; Compl. 14).

Furthermore, the "political views" the City targeted—QTBIPOC affirmation, anti-discrimination statements of communal values, and memorializing a transgender Latina icon and beloved community member—are not abstract political positions; they are expressions deeply intertwined with the Plaintiffs' protected identities and associational rights. (Tellez Aff. 4, 5, 7, 9, 11, 12). Censoring these expressions is discriminating against the Garden's QTBIPOC community itself.

## II. PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM

The immediate and irreparable harm facing Plaintiffs, detailed above, is threefold, and each form of harm is independently sufficient to justify a Preliminary Injunction. The City's actions threaten not just Plaintiffs' constitutional rights in the abstract, but their community's very existence, their personal safety, and the life of the garden itself.

### A. The Loss of First Amendment Freedoms is Irreparable Harm *Per Se*

First, the loss of First Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. at 373. The City's attempted termination of the license, and its campaign of selective harassment, are ongoing violations of Plaintiffs' rights to speak and associate freely. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) ("The loss of First Amendment freedoms is a judicially-recognized form of irreparable injury."). This is not a speculative or future harm; it is a present and continuing injury. The City's termination letter, predicated on Plaintiffs' refusal to censor their speech, acts as a direct penalty for their expression. The speech Defendants are suppressing and attacking includes:

1. *Pure Speech*: The Garden's "Community Values," which are written statements agreed upon by the Garden's current members of all faiths and backgrounds, affirming an anti-discriminatory and safe environment for all, particularly its QTBIPOC members. (Ex. M; Tellez Aff. 4; Ayres Aff. ¶¶ 1-6; Compl. 16).

2. *Symbolic Speech:* The Cecilia Gentili memorial, a small, unique, and irreplaceable altar made by QTBIPOC Garden and community members expressing remembrance, community identity, and reverence for a beloved transgender activist. (Ex. C, J; Tellez Aff. 5; Compl. 17). *See, e.g., Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (establishing that to determine whether conduct or an object constitutes "speech" for First Amendment purposes, a court must ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those

14

who viewed it." The altar easily satisfies this test. Garden members clearly convey a message of honor and remembrance for a trans activist icon, and given the context and composition of the altar, including a trans flag and Cecilia's image, observers would easily understand this message. (Ex. C)). *See also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 569 (1995) (affirming that the protections of the First Amendment extend broadly to expressive conduct including paintings and other art forms).

3. *Expressive Association*: The right to gather as a QTBIPOC-affirming group, a mission the City has actively tried to dismantle by demanding the group alter its core protective principles. (Ex. D, E, F; Tellez Aff. 11, 12, 20, 21; Compl. 16). *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.").

Without an injunction, the City will continue to violate Plaintiffs' constitutional rights by attacking their deeply rooted expressions of QTBIPOC solidarity and existence.

**B. The Destruction of an Irreplaceable Community Sanctuary and the Garden Itself, and the Possible Damage to the Altar to Cecilia, are Irreparable Harms**

Second, the dismantling of the Garden is the destruction of an irreplaceable cultural institution and community sanctuary. (Ex. E, F; Tellez Aff. 9). This is not merely a dispute over a plot of land; it is about the preservation of a unique safe haven for all members of the public, and particularly for marginalized community members.

15

1. *Destruction of the Community and Sanctuary:* The City's plan to terminate the Garden's organization is not a remedy but the final act of erasure. It would destroy the specific, trust-based community Plaintiffs have built, rendering meaningless their years of labor in creating a unique safe haven available to all members of the public. The Garden's value lies in its identity as a protective space particularly for those who are disproportionately harassed and discriminated against elsewhere, an identity the City has directly and doggedly attacked. The loss of this specific place, with its deeply rooted culture and mission, is an irreparable injury to the community that relies on it. The loss of an ongoing community enterprise and the goodwill associated with it constitutes irreparable harm. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (recognizing that the loss of an ongoing business is an irreparable harm).

2. *Destruction of Physical Property and the Garden Itself:* The City's termination notice threatens the removal of all of the Garden's property. (Tellez Aff. 8). This includes the Cecilia Gentili altar itself, which is under direct threat of being dismantled and discarded, with the City disclaiming any damages. (Tellez Aff. 8; Compl. 18). The garden itself faces destruction not only from foreseeable public action fomented by Defendants' campaign (including a commenter's $5,000 bounty to destroy the garden), but from the City's withholding of critical resources and its threatened disruption of the Garden's organization. (Ex. B, L; Tellez Aff. ¶¶ 13-20). Hundreds of pounds of fall harvest foods from the currently flourishing and laboriously cultivated garden are threatened if the organization is

16

disrupted and the gates are locked (Tellez Aff. ¶¶ 13-15). The destruction of unique property, particularly property with significant cultural and community value, is a well-recognized form of irreparable harm. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (noting that harms that cannot be fully remedied by monetary damages are irreparable).

The loss of such a unique institution cannot be remedied by monetary damages alone. The harm is the erasure of the Garden's community itself.

### C. The City-Fomented Climate of Harassment Threatens Grave Irreparable Harm

Third, the City's actions and statements have foreseeably unleashed a torrent of harassment and violent threats that now endanger Plaintiffs' physical safety. (Ex. L; Tellez Aff. ¶¶ 10-12; Ayres Aff. 6). By validating the complaints of a "transphobe," the City has given official sanction to private bigotry, creating a climate where violent threats are now common. Despite making Defendants aware of this, they only intensified their discriminatory. repressive, and retaliatory campaign, effectively green-lighting such harassment and opening the door to foreseeable violence. (Ex. O; Tellez Aff. 10; Compl. 22-23). *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("[T]he law cannot, directly or indirectly, give [private biases] effect.").

Defendants have conducted a concerted public campaign, led by its highest official, to vilify Plaintiffs and ratify the discriminatory actions taken against them. (Ex. O). This official condemnation functions as a continuing form of retaliation, designed to intimidate and punish Plaintiffs for exercising their rights. Such a "threat of discipline by a state actor is sufficient to

17

create a judicially cognizable chilling effect." *Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992). These are not hypothetical fears. The record shows:

1. *Direct Incitement to Violence Fomented by the City:* Commenters, emboldened by the City's actions, called for Plaintiffs and their families to be murdered with "sarin gas," "gasoline and matches," or explosive "pagers." (Ex. L).

2. *Dehumanizing Rhetoric:* The attacks have included dehumanizing slurs, referring to Muslim members with terms like "Moos lum festation" and "table cloth heads," and calling a transgender member "an It." (Ex. L; Tellez Aff. 10).

3. *Real-World Manifestation:* These online threats escalated into a terrifying in-person confrontation on September 22, 2024, when six men entered the Garden, cornered two immigrant stewards of color, and menaced them with aggressive, racially charged questions. (Tellez Aff. 11; Compl. 21).

The threat of physical violence is a quintessential form of irreparable injury. *See Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (recognizing that preventing "violence and physical intimidation" is a compelling interest). This Court's immediate intervention is required to halt the City's unlawful campaign and prevent the grave harm it continues to inflict.

### III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR PLAINTIFFS

The balance of equities tips decidedly in Plaintiffs' favor. The harm to Plaintiffs if the Preliminary Injunction is denied is immediate and irreparable: the loss of constitutional rights, the dismantling of a unique community space, and exposure to ongoing threats of violence emboldened by the City's discrimination and constitutional violations. In contrast, the harm to

18

the City if the Preliminary Injunction is granted is non-existent. The City is merely asked to maintain the status quo and refrain from violating the Constitution pending a full hearing, a status quo the City had, until recently, agreed to maintain, demonstrating that doing so imposes no undue burden.

The public interest is overwhelmingly served by granting the injunction. When a party alleges a First Amendment injury, the likelihood of success, balance of equities, and public interest prongs of the analysis merge. *See New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1343-44 (2d Cir. 1989); *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("It is always in the public interest to prevent the violation of a party's constitutional rights."). The public has a profound interest in the vindication of constitutional rights, enforcement of anti-discrimination laws, and preservation of vital community green spaces that serve the public, and especially marginalized populations. Indeed, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and the public interest is served by preventing that loss.

There is no public interest in allowing a government agency to act on discriminatory motives or to retaliate against citizens for their protected speech. To the contrary, the public interest is harmed when the government gives effect to private biases, which is precisely what Plaintiffs have alleged here with substantial evidence. *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). The City has no legitimate interest in enforcing an unconstitutional policy or effectuating a retaliatory license termination. Therefore, both the balance of hardships and the public interest weigh decisively in favor of granting the Preliminary Injunction.

19

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue an immediate Preliminary Injunction enjoining Defendants, their agents, and employees from terminating or effectuating the termination of the Garden's license; from evicting, removing, or locking out Plaintiffs or their property from the Garden; and from otherwise interfering with the Garden's peaceful and usual operation pending further proceedings in this matter.

Dated: August 19, 2025

New York, New York

Respectfully submitted,

JONATHAN WALLACE
/s/ Jonathan Wallace
Attorney for Plaintiffs
PO #728
Amagansett, NY 11930
(917) 359-6234
Jonathan.wallace80@gmail.com

NICHOLAS F CROSS
/s/ Nicholas F Cross
Attorney for Plaintiffs
130 E. 18th St.
Brooklyn, NY, 11226
(414) 687-3703
ncross022@gmail.com