UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SUNSET GARDEN OF RIDGEWOOD, INC., and
INDALESIO TELLEZ,

    *Plaintiffs*,

v.

THE CITY OF NEW YORK, NYC DEP'T OF PARKS AND RECREATION, NYC PARKS GREENTHUMB,
and CARLOS MARTINEZ, CHIEF OF STAFF OF NYC PARKS GREENTHUMB

    *Defendants*.

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Civil Case No.: 1:25-cv-04258 (LDH)(MMH)

Hon. Judge LaShann DeArcy Hall and Magistrate Judge Marcia M. Henry

Date of Service: September 18, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................................................................................3

PRELIMINARY STATEMENT................................................................................................5

ARGUMENT..................................................................................................................................6

    I. PLAINTIFFS HAVE DEMONSTRATED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS............................................................................................................................6

        A. The City's Article 78 Defense is Procedurally and Substantively Meritless..................6

        B. The City's Proffered "Rational Bases" for Termination Are a Transparent Pretext for Unlawful Discrimination and Retaliation...............................................................................7

            1. The City's Allegations Regarding the "Community Values" Are an Attempt to Mask Discriminatory Enforcement and Changing Requirements................................7

            2. The City's "Unauthorized Monument" Justification is Fatally Undermined by Its Own Admissions of Selective Enforcement and Disparate Treatment..........................9

        C. Plaintiffs' Discrimination Claims Are Overwhelmingly Supported by Direct Evidence of Discriminatory Selective Enforcement............................................................................10

        D. The City's Defenses to the First Amendment Claim Fail Because Its Actions Constitute Viewpoint Discrimination..................................................................................11

    II. PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM..................12

        A. The Loss of First Amendment Freedoms is Irreparable Harm Per Se..........................12

        B. The Destruction of an Irreplaceable and Carefully Cultivated Community Sanctuary Is Irreparable Harm..................................................................................................................13

        C. The City-Fomented Climate of Harassment, Ratified by Its Highest Officials, Threatens Grave and Irreparable Harm to Plaintiffs' Safety..............................................13

    III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DECIDEDLY FAVOR GRANTING THE INJUNCTION.......................................................................................14

CONCLUSION............................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*557 Ent. Inc. v. City of N.Y.*,
 2025 U.S. App. LEXIS 16643 (2d Cir. 2025)..........................................................................11

*Abbott v. Pastides*,
 900 F.3d 160 (4th Cir. 2018)...................................................................................................14

*Cee-Jay Real Estate Dev. Corp. v. New York City Dep't of Parks & Recreation*,
 226 A.D.3d 774 (2d Dep't 2024)...............................................................................................7

*Cornelio v. Connecticut*,
 32 F.4th 160 (2d Cir. 2022)...............................................................................................11, 12

*Elrod v. Burns*,
 427 U.S. 347 (1976)................................................................................................................12

*Felder v. Casey*,
 487 U.S. 131 (1988).........................................................................................................5, 6, 7

*Holloway v. City of N.Y.*,
 212 N.Y.S.3d 915 (Sup. Ct. N.Y. Cty. 2024)............................................................................7

*Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*,
 311 F.3d 534 (2d Cir. 2002)....................................................................................................11

*KH Outdoor, LLC v. City of Trussville*,
 458 F.3d 1261 (11th Cir. 2006)...............................................................................................14

*Levin v. Harleston*,
 966 F.2d 85 (2d Cir. 1992)......................................................................................................14

*Lloyd v. N.Y. Botanical Garden*,
 2004 U.S. Dist. LEXIS 18749, at 18 (S.D.N.Y. Sept. 15, 2004).............................................11

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
 429 U.S. 274 (1977)................................................................................................................10

*New York State Nat. Org. for Women v. Terry*,
 886 F.2d 1339 (2d Cir. 1989)..................................................................................14

*Palmore v. Sidoti*,
 466 U.S. 429 (1984)................................................................................................13

*Pleasant Grove City v. Summum*,
 555 U.S. 460 (2009)................................................................................................12

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
 515 U.S. 819 (1995)................................................................................................11

*Straka v. Lesbian Gay Bisexual & Transgender Cmty. Ctr., Inc.*,
 2020 N.Y. Misc. LEXIS 3083 (Sup. Ct. N.Y. Cty. July 1, 2020)............................10

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
 60 F.3d 27 (2d Cir. 1995)........................................................................................13

*U.S. Dep't of Agric. v. Moreno*,
 413 U.S. 528 (1973)................................................................................................11

*Wandering Dago, Inc. v. Destito*,
 879 F.3d 20 (2d Cir. 2018).................................................................................11, 12

*Williams v. N.Y.C. Hous. Auth.*,
 61 A.D.3d 62 (1st Dep't 2009)................................................................................10

**Statutes and Rules**

42 U.S.C. § 1983… *passim.*

N.Y.C. Admin. Code § 8-107… *passim.*

# PRELIMINARY STATEMENT

Defendants' opposition is a masterclass in misdirection. It presents a sterile, procedural defense of a simple contract termination, asking this Court to ignore the mountain of evidence that exposes this narrative as a pretext for unlawful viewpoint discrimination against a QTBIPOC-affirming community and flourishing community garden. The City argues it acted rationally, yet its own director apologized for its "unfair policies." It claims it acted neutrally, yet its own chief of staff admitted to practicing selective enforcement. It claims it acted without bias, yet its director admitted to "empowering a transphobe." These are not mere allegations; they are direct admissions that shatter the City's narrative of good faith and provide precisely the kind of evidence of improper motive required to establish a likelihood of success on the merits.[1]

The City's legal arguments are built on the same hollow foundations. It argues that an Article 78 proceeding is the exclusive remedy for this dispute, ignoring that a state procedural rule cannot divest a federal court of its jurisdiction over core federal constitutional claims.[2] It argues that the Garden's community altar is "government speech," which is directly contradicted by the City's own license agreement (Def. Exh. A, 12(b)), let alone the clearly personal nature of the altar. And it cynically argues that Plaintiffs face no irreparable harm because they can simply join the new garden group the City intends to install, sanitized of its current leadership and expression—a group that would be the very fruit of the City's discriminatory actions.

---

[1] The City's opposition entirely fails to address its most damaging evidence. Its papers are silent on the Muñoz text message. It offers no meaningful response to the Martinez recording. Its after-the-fact justifications for its actions on the Community Values and the altar crumble upon review of its emails, which show the City repeatedly assured the Garden that its requirements were met before abruptly moving the goalposts. (Pl. Exh. K, P, R). Its explanation for the disparate treatment of the QTBIPOC-affirming altar versus the much larger brightly painted–but content neutral– woodcut is the patently false claim that the City was unaware of it (Pl. Exh. Q) and the unserious, incredible claim that the City "did not consider the woodcut to be art." (Martinez Decl. 27).
[2] *See Felder v. Casey*, 487 U.S. 131, 138 (1988).

This Court should not be misled. This is a civil rights case about the state punishing a vulnerable community for its identity and its speech. Plaintiffs have demonstrated a clear likelihood of success on the merits, face immediate and multilayered irreparable harm, and the balance of equities overwhelmingly favors preserving a vital community over allowing the City to gain from its unconstitutional conduct. This Court should grant the preliminary injunction.

**ARGUMENT**

**I. PLAINTIFFS HAVE DEMONSTRATED A CLEAR LIKELIHOOD OF SUCCESS ON THE MERITS**

The City's opposition attempts to construct a defense from four brittle pillars: a fundamentally flawed procedural argument, a pretextual "rational basis" narrative, a misapplication of First Amendment doctrine, and a misunderstanding of the NYCHRL. Each pillar collapses under the weight of the evidence and controlling law.

**A. The City's Article 78 Defense is Procedurally and Substantively Meritless.**

The City's primary defense is a procedural trap, arguing that Plaintiffs' sole remedy lies in a New York State Article 78 proceeding. (Opp. at 4). This argument is fundamentally incorrect and must be rejected.[3] First, a state procedural rule cannot strip a federal court of its jurisdiction over a federal constitutional claim. Plaintiffs have brought claims under 42 U.S.C. § 1983 for violations of their First Amendment rights. This Court has federal question jurisdiction over

---

[3] The City's bad-faith inclusion of the state court transcript containing dicta from Justice Kingo is revealing. (Pl. Exh. K). Justice Kingo's preliminary concerns—raised without the benefit of full briefing or all the evidence now before this Court—profoundly misapprehended both the facts and controlling federal law. His musings about Article 78 and exhaustion are directly contrary to settled Supreme Court precedent for § 1983 claims. *See Felder*, 487 U.S. at 138. His concerns about standing and proper parties were cured by amendment. His entire analysis was improperly filtered through a state-law contract lens, ignoring the gravity of the constitutional claims at issue. Most importantly, he mischaracterized clearly personal expressions as those of the state, as further discredited below in Sec. I(D). For the City to now proffer these vacated, preliminary musings as persuasive authority is improper.

6

these claims pursuant to 28 U.S.C. § 1331. The City's reliance on state cases[4] is entirely misplaced, as those cases did not involve federal § 1983 claims.[5] Second, an Article 78 is a wholly inadequate path for the relief Plaintiffs seek. Plaintiffs' discrimination claims require discovery into the City's motives, a process that is severely limited in a special proceeding. Importantly, Plaintiffs seek compensatory and punitive damages for emotional distress and the violation of their constitutional rights, remedies unavailable in an Article 78 proceeding.[6]

### B. The City's Proffered "Rational Bases" for Termination Are a Transparent Pretext for Unlawful Discrimination and Retaliation.

The core of the City's defense is the assertion that its decision to terminate the license was based on two "rational" and non-discriminatory license violations. (Opp. at 6-13). This narrative is an insidious fiction, meticulously constructed to sanitize a decision rooted in bigotry and retaliation, and it is directly contradicted by the City's own admissions.

#### 1. The City's Allegations Regarding the "Community Values" Are an Attempt to Mask Discriminatory Enforcement and Changing Requirements.

The City grossly mischaracterizes the Garden's "Community Values" as an exclusionary "ideological litmus test." (Opp. at 6). This is a deliberate and malicious reframing.[7] Members come from all backgrounds and faiths, and the Garden has never barred or removed anyone from membership. (Ayres Aff. 1-6; Tellez Aff. 2, 4). The Garden made explicitly clear that the

---

[4] E.g., *Cee-Jay Real Estate Dev. Corp. v. New York City Dept. of Parks & Rec.*, 226 A.D.3d 774 (2d Dep't 2024).
[5] A state procedural preference for Article 78 cannot bar a plaintiff from seeking redress for federal constitutional violations in a federal forum. *See Felder,* 487 U.S. at 151 (state notice-of-claim provisions are preempted in § 1983 actions because they are "manifestly inconsistent with the central purpose of the federal statute").
[6] *See Holloway v. City of N.Y.*, 212 N.Y.S.3d 915 (Sup. Ct. N.Y. Cty. 2024) (recognizing that a plenary action, not an Article 78 proceeding, is the proper vehicle for NYCHRL claims seeking damages). A plenary action in this Court is not a procedural defect; it is a necessity to fully vindicate Plaintiffs' federal and state rights.
[7] A plain reading shows this was a deeply caring "evolving document" laboriously created through collaboration and consensus with opportunities for even non-members to have provided feedback or questions during open hours or anonymously "at any time" to ensure the Garden remains a safer space for its members by stating that current members committed "to interrupting" specific harmful "behavior," such as harassment or racist, anti-semitic, Islamophobic, ableist, or otherwise discriminatory actions. (Pl. Exh. M, Compl. 17).

7

"Garden is committed to maintaining an open and diverse membership" and that "Anyone is welcome to join us" in the opening of its binding Garden Handbook (Pl. Exh. G).[8]

The City's pretext is exposed by its own emails, which show that the Garden was led to believe it had satisfied the City's concerns long before the termination. On Oct. 21, 2024, GreenThumb Director Alex Muñoz explicitly stated that the issue "will be satisfied by removing that checkbox on the membership form." (Pl. Exh. P). As the City concedes, the Garden complied with this demand. (Opp. at 7). Mr. Muñoz confirmed the Values would remain and that the only issue was framing; the Garden would work on "how to ensure potential members understand the community agreements and values the group has stated." (Pl. Exh. P).

The City's fresh focus on the consensually agreed upon self-imposition that "[a]ll members agree to uphold the following commitments in order to maintain membership status," is a post-hoc rationalization. (Opp. at 7). This sentence, buried in the values document, was so insignificant that the City failed to even mention it in its termination letter. (Pl. Exh. H). It is a red herring, manufactured for litigation after the City had already signaled the Values' approval.[9]

---

[8] A group of people consensually agreeing to commit themselves to an anti-harassment policy is not a "litmus test"; it is a reasonable means of ensuring inclusivity and protecting against exactly the type of credible threats and in-person harassment the City has fomented. Far from being a rigid set of rules, the Values document stated that its members were "committed to revisit these values" on a regular basis or "as needed" based on feedback. (Pl. Exh. M). They specifically said "This is not the space to shame or bully anyone based on identities or appearances," and that "we strive to foster a feeling of security and support when there is a sense of acceptance, inclusion, and purpose for all members." (*Id.*). The Garden makes it unambiguous that "With collaboration as a core value we agree to listen and evolve together as a community…. We do not shy away from hardship or conflict, and work together to create intentional community." (*Id.*). The Garden members even prompted themselves to think about whether their presence was "inviting and welcoming to others" and "mak[ing] it easy for others to feel included." (*Id.*). Members affirmed that "We understand that conflict will arise when building an intentional community, and that meeting it with respect and restorative practices will benefit us all." (*Id.*). They said that "With caring as a core value we agree to treat each other and the land with kindness and understanding, appreciate the differences in others; show patience, and lean on empathy and understanding for others." (*Id.*). The document is a testament to inclusivity, care, acceptance of differences, and commitment to growth, re-evaluation, and working through conflict.

[9] Despite the City's having indicated their approval, in accordance with the City's wishes and in order to protect the community against termination, the Garden deleted the term "Zionist" prior to filing this lawsuit even though they understood Zionism as one form of discrimination listed among many that they had a right to say they would intervene in as a matter of practice. (2nd Tellez Aff. 6-12). To err on the side of caution, since then, the Garden added yet more sentences making crystal clear that "These Values statements are self imposed and mutually agreed

This pattern of admittedly "shifting" requirements, (Pl. Exh. A), particularly after Mr. Muñoz acknowledged that "revising bylaws will require time, especially a group like yours with non-hierarchical processes," is powerful evidence of bad faith and pretext. (Def. Exh. C).

### 2. The City's "Unauthorized Monument" Justification is Fatally Undermined by Its Own Admissions of Selective Enforcement and Disparate Treatment.

The City's claim of rigid, neutral enforcement regarding the Cecilia Gentili altar is demonstrably false. Its pretext is shattered not only by admissions of selective enforcement, but by emails proving the Garden was told it had complied with all requirements for the altar.

On February 6, 2025, GreenThumb employee Valery Zorrilla confirmed the Garden's art proposal "received GreenThumb approval following all required processes and policies." (Pl. Exh. R). The City's claim that the Garden was unresponsive regarding insurance is yet another fabrication. When the Public Art Coordinator requested a certificate of insurance, Ms. Zorrilla told the Garden not to worry, stating, "I can provide them with the insurance you have at the garden," and confirmed, "No money should be put towards this." (Pl. Exh. R). The Garden was plainly told it had met all its obligations. The City's contrary assertions are blatant falsehoods designed to paint the Garden as non-compliant.[10] The City's claims are fatally undermined by

---

upon by consensus and are subject to change and feedback from both prospective and current members. They do not prohibit or discourage anyone, of any identity, from joining or remaining in the Garden or expressing different viewpoints, who does so without illegally harassing, threatening, or discriminating against others." The Garden also removed the freshly complained-of sentence "All members agree to uphold the following commitments in order to maintain membership status" (although the members maintain that they can consensually agree to standards imposed upon themselves and that prohibiting them from doing so is a violation of their freedoms of expression and association). (*Id.*). A copy of the current Values statement can be found here:
https://docs.google.com/document/d/10ifvn2jCwFoYPAuxNc4WVYcQ6xRZuf1t3FEUu1E0FUs/

[10] The City also mischaracterizes the Garden's intent. The Garden did not insist on a "permanent" installation from the outset. As Tellez attests, the altar itself is impermanent and ever-changing, with visitors adding flowers, pictures, and notes in tribute to Cecilia, and now supporting growing plants as a trellis. (2nd Tellez Aff. 5). The Garden only inquired about the "permanent" process after the City offered the insulting alternatives of moving the deeply personal memorial for a beloved icon who lived down the street to another borough or replacing it with a different altar yearly, after the City refused to answer basic questions about what qualified as a "large" art installation under its own rules, and despite GreenThumb's admittedly not enforcing this rule in other gardens or even against the Garden's much more prominent painted woodcut. (2nd Tellez Aff. 5; Pl. Exh. A, Q).

9

three additional pieces of evidence: the Martinez recording,[11] the large and brightly painted woodcut disparity,[12] and the Muñoz Text.[13] Plaintiffs have shown that their protected speech was a motivating factor.[14] The City cannot show it would have taken the same action regardless, and has directly admitted that it does not in fact take these actions with other gardens.

**C. Plaintiffs' Discrimination Claims Are Overwhelmingly Supported by Direct Evidence of Discriminatory Selective Enforcement.**

The City argues that Plaintiffs have failed to state a discrimination claim because its actions were based on Plaintiffs' "political views," not their protected status.[15] (Opp. at 15). This is a disingenuous attempt to sever Plaintiffs' expressive identity from their protected status.[16]

Under the NYCHRL's broad standard, Plaintiffs need only show they were "treated less well" and that discrimination played *any* role. *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009). The powerful evidence of selective enforcement combined with the direct evidence of discriminatory motive makes success on this claim overwhelmingly likely.

---

[11] GreenThumb Chief of Staff Carlos Martinez admitted on the record that the agency routinely "turn[s] a blind eye" to memorials and art in other gardens because they are "part of the vibrancy of gardens." (Compl. 20). This is a direct confession of a policy of non-enforcement from which the City specifically and punitively deviated.
[12] The City's pretext is further exposed by its complete inaction regarding a much larger, unlicensed, seven-foot-tall brightly painted woodcut in the very same Garden. (Compl. 19). The City's claim of ignorance is belied by its own social media; a 2023 GreenThumb Instagram post prominently features the massive, bright woodcut on the entrance path, showing the City has been aware of it for years. (Pl. Exh. Q). The City's after-the-fact excuse, offered in its legal papers, that it "did not consider the woodcut to be art" is facially incredible. (Martinez Decl. 27).
[13] The City's entire "rational basis" narrative is shattered by GreenThumb Director Alex Muñoz, who apologized for the "unfair policies," the "changing requirements," and "empowering a transphobe" (Pl. Exh. A).
[14] *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).
[15] Citing *Straka v. Lesbian Gay Bisexual & Transgender Cmty. Ctr., Inc.*, 2020 N.Y. Misc. LEXIS 3083 (Sup. Ct. N.Y. Cty. July 1, 2020)
[16] The *Straka* case, involving a dispute between private parties over political affiliations, is entirely inapposite. Here, a government is targeting a community, and the Muñoz text provides a direct link: the City's actions were instigated by a "transphobe" who the City knowingly "empowered." (Pl. Ex. A). This is not a disagreement over abstract political philosophy; this is direct evidence of discrimination based on gender identity, a protected characteristic under the NYCHRL. The "political views" the City targeted—QTBIPOC affirmation, anti-discrimination, and memorializing a transgender icon–are expressions deeply intertwined with the Plaintiffs' protected identities.

### D. The City's Defenses to the First Amendment Claim Fail Because Its Actions Constitute Viewpoint Discrimination.

The City's actions must be analyzed under the First Amendment's forum doctrine. The Garden is a nonpublic forum where any restriction on speech must be reasonable and, above all, *viewpoint-neutral*.[17] The City's attempt to justify applying rigid "public park" art installation rules to a community garden is a clear pretext for targeting Plaintiffs' speech.[18] By privileging a transphobe and targeting these specific messages and the altar, the City committed textbook viewpoint discrimination, disfavoring speech due to the "motivating ideology or the opinion or perspective of the speaker."[19] The claim of neutrality evaporates under any level of scrutiny.[20]

The City's license makes clear the Garden is not a public park: the License "shall not be deemed to indicate any intention to dedicate the Garden for park use." (Def. Exh. A, 12(b)).

---

[17] In *Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002), the court found that the record before it did not establish whether the outdoor garden at Lincoln Center was a nonpublic or limited public forum, but held that that distinction did not matter to the First Amendment outcome. In any event, the Garden is neither an unlimited public forum nor, of course, a government agency, so the City's entire line of argument about the Garden's First Amendment duties is inapposite.

[18] Federal courts recognize that operating gardens is not a core government function. *See, e.g., Lloyd v. N.Y. Botanical Garden*, 2004 U.S. Dist. LEXIS 18749, at *18 (S.D.N.Y. Sept. 15, 2004) (the operation of a botanical garden is not a function "traditionally the exclusive prerogative of the State." distinguishing it from public parks).

[19] *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018).

[20] i) *Strict Scrutiny*: The strict scrutiny standard applies in the instant case due to the City's viewpoint discrimination. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("When the government targets… particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant… Viewpoint discrimination is thus an egregious form of content discrimination."). The City's actions are not narrowly tailored to a compelling government interest. The City has no compelling interest in silencing QTBIPOC-affirming speech or siding with a "transphobe." Its stated interest in uniform rule enforcement is not compelling, as evidenced by its own admissions of non-enforcement. Further, terminating the entire license is the opposite of narrow tailoring; it is a sledgehammer that destroys a community to remove a small, heartfelt memorial.
ii) *Intermediate Scrutiny*: Even if this court were to decide to apply intermediate scrutiny, the City's actions fail. The license termination does not advance an important government interest and it burdens substantially more speech than necessary. *Cornelio*, 32 F.4th at 171. The destruction of the Garden community, its events, its harvest, and all of its expressive activities is a grossly disproportionate burden to address the City's manufactured concerns over the altar and community values, for which less restrictive alternatives were readily available and even promised.
iii) *Rational Basis*: Rational basis only applies when there is not a plausible or significant First Amendment claim. The City's actions even fail this lowest bar. A government action motivated by "animosity" or "a bare desire to harm a politically unpopular group" is not rational. *See, e.g., U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). The director's admission of "empowering a transphobe," the Chief of Staff's admission of selective enforcement, and the arbitrary distinction between the altar and the larger woodcut reveal decision-making devoid of reason and animated by pretext. *See 557 Ent. Inc. v. City of N.Y.*, 2025 U.S. App. LEXIS 16643, at *10 (2d Cir. 2025).

This exposes the City's shell game. The license generally requires compliance with Parks rules (Opp. at 10), but the *GreenThumb Handbook*—the extensive rules created for gardens—requires approval only for "*Large* art installations." (Pl. Ex. J).[21] Enforcing an otherwise unenforced rule by targeting disfavored speech is textbook viewpoint discrimination.[22] The City's actions are thus subject to strict scrutiny and are presumptively unconstitutional.[23]

The City's attempt to paint the altar as "government speech" under *Pleasant Grove City v. Summum,* 555 U.S. 460 (2009), is meritless. *Summum* involved a large, permanent civic monument in a central public park. Here, we have a small, community-built altar in a garden that the City's own contract specifies is not for park use. Damningly, the City disclaims responsibility for the Garden's conduct. (Def. Exh. A, § 20). No reasonable person would mistake this deeply personal memorial for an official City statement.

## II. PLAINTIFFS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM

The City callously argues that Plaintiffs will suffer no harm because they can simply join a new, sanitized group, demonstrating a startling disregard for the nature of the harms at stake, each of which is independently sufficient to warrant injunctive relief.

### A. The Loss of First Amendment Freedoms is Irreparable Harm *Per Se*.

It is black-letter law that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[24] The City's license termination is a direct penalty for Plaintiffs' protected speech. To allow it to stand inflicts irreparable harm.

---

[21] When repeatedly asked, the City could not produce a *single* example of this burdensome process or the GreenThumb Handbook's rule ever being imposed on any of the other 500+ gardens. (2nd Tellez Aff. 5).
[22] *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018).
[23] *See Cornelio v. Connecticut*, 32 F.4th 160, 170 (2d Cir. 2022).
[24] *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

12

### B. The Destruction of an Irreplaceable and Carefully Cultivated Community Sanctuary Is Irreparable Harm.

The City's suggestion that a new garden group can simply replace the old one is a cynical trivialization of what a community is.[25] The Sunset Garden of Ridgewood is not just soil and plants; it is a unique cultural institution and a safe haven intentionally built by and for its QTBIPOC members and allies. (Compl. 13, 16). Its destruction is a profound and irreversible loss that cannot be compensated with money, or replaced by a City-sanitized substitute that would be the fruit of the City's own discriminatory conduct.[26]

### C. The City-Fomented Climate of Harassment, Ratified by Its Highest Officials, Threatens Grave and Irreparable Harm to Plaintiffs' Safety.

The City's actions have foreseeably unleashed a torrent of harassment and violent threats that now endanger Plaintiffs' physical safety. (Compl. 22-23). Plaintiffs reported the threats to GreenThumb, which did nothing but escalate its campaign. (Tellez Aff. 11).[27] By "empowering a transphobe" and having its own Mayor falsely claim the Garden "barred" people from the space and brand the Garden as a source of "hate," the City has given official sanction to private bigotry.[28] (Pl. Exh. A, L, O).

This official encouragement has led directly to online death threats (calls to murder Plaintiffs with "sarin gas" or "gasoline and matches") and a terrifying in-person confrontation

---

[25] This argument ignores the Second Circuit's recognition that the loss of an ongoing community enterprise and its goodwill is irreparable harm. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).
[26] The threat is not just to the community, but to the garden itself, including the altar and hundreds of pounds of harvest foods, which the City will destroy if it disrupts the Garden's stewardship. (Tellez Aff. 13-15).
[27] The City's suggestion that the Garden report threats to the NYPD is both insulting and naive. (Opp. at 22). The Garden has every reason to believe the NYPD "will only harm or, at best, ignore" them. (2nd Tellez Aff. 4). The NYPD has not been a source of protection but of intimidation. Police have come to harass gardeners, illegally parking squad cars in a crosswalk to interrogate stewards about a license for a garden hose (which they had) *during its Pride Month Kickoff event*. (Pl. Exh. D; 2nd Tellez Aff. 3-4). An unmarked police car was sent to surveil the garden three days later, leaving only when confronted. (2nd Tellez Aff. 4). Plaintiffs also have reason to believe a Queens Police Officer is spreading defamatory lies about them online. (*Id*.; Pl. Exh. O).
[28] *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("[T]he law cannot, directly or indirectly, give [private biases] effect.").

where immigrant garden members were menaced. (Compl. 22-23). The City cannot wash its hands of this violence. Its own officials' statements, such as Mayor Adams' false condemnation, are continuing acts of retaliation designed to chill Plaintiffs' speech and punish them.[29]

**III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DECIDEDLY FAVOR GRANTING THE INJUNCTION**

The balance of equities tips decisively in Plaintiffs' favor. The harm to Plaintiffs if the injunction is denied is immense and immediate: the loss of constitutional rights, the dismantling of their unique community space, and exposure to ongoing threats of violence. In contrast, the harm to the City if the injunction is granted is non-existent. The City is merely asked to maintain the status quo and refrain from violating the Constitution pending a full hearing.

The public interest is overwhelmingly served by granting the injunction. The public has a profound interest in the vindication of constitutional rights, enforcement of anti-discrimination laws, and preservation of vital community sanctuaries that serve marginalized populations.[30] There is no public interest in allowing a government agency to act on discriminatory motives or to retaliate against citizens for their protected speech.[31]

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction and enjoin Defendants from terminating the Garden's license and interfering with the Garden's operations pending the final resolution of this action.

---

[29] *See Levin v. Harleston*, 966 F.2d 85, 89 (2d Cir. 1992). The threat of physical violence is a quintessential form of irreparable injury. *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).
[30] *See New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1343-44 (2d Cir. 1989) (noting that the public interest prong merges with the others in First Amendment cases).
[31] *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance.").

Dated: September 18, 2025                    Respectfully submitted,

New York, New York                           JONATHAN WALLACE
                                             /s/ Jonathan Wallace
                                             Attorney for Plaintiffs
                                             PO #728, Amagansett, NY 11930
                                             (917) 359-6234, Jonathan.wallace80@gmail.com

                                             NICHOLAS F CROSS
                                             /s/ Nicholas F Cross
                                             Attorney for Plaintiffs
                                             130 E. 18th St., Brooklyn, NY, 11226
                                             (414) 687-3703, ncross022@gmail.com